# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BRENDA MYERS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 06 CV 04951 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| WICKES FURNITURE CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Brenda Myers brought this suit against Defendant Wickes Furniture Co., Inc. for alleged violations of the Family and Medical Leave Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, and the Illinois Workers' Compensation Act. R. 34.[1] Before the Court is Wickes's motion for summary judgment. R. 75. For the reasons explained below, the motion is granted in part but largely denied in part.

## I.

Myers was an Administrative Manager, Office Manager, and Office Administrator for Wickes Furniture at its Bedford Park and North Riverside locations. R. 77 ¶ 5.[2] Myers was hired in 1998 as an Administrative Manager in Training for the Bedford Park location. *Id.* ¶ 7. In December 1998, she was transferred to the North

---

[1]The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and over the state claim under supplemental jurisdiction 28 U.S.C. § 1367. Citation to the docket is "R." followed by the entry number and, when applicable, the page or paragraph number.

[2]The facts are drawn from the parties' Rule 56.1 statements, viewed in the light most favorable to the non-movant (Myers). R. 77; R. 86.

Riverside location in the same position. *Id.* ¶ 8. She returned to the Bedford location as an Administrative Manager in July 1999. *Id.* ¶ 8. In June 2003, Myers's job title changed to Office Manager, and in February 2004, it again changed, this time to Office Administrator. *Id.* The title changes were not promotions, but part of company-wide changes in titles. *Id.* Myers was terminated on January 8, 2005, while she was working as Office Administrator at the Bedford Park location. *Id.* ¶ 9. Myers's responsibilities included coordinating and training office personnel, coordinating payroll, resolving customer and store issues, and assisting the store manager. *Id.*

Brenda Green was store manager of the Bedford location from October 2003 through Myers's firing. *Id.* ¶ 10. Green's boss from June 2003 through Myers's firing was Dave Mattea. *Id.* ¶ 11. The decision to fire Myers was made by Green and Mattea and approved by the Vice President of Human Resources, Dick Petersen. *Id.* ¶ 12. Wickes justifies Myers's termination by alleging that Myers had "poor attitude and behavior." *Id.* Not surprisingly, Myers contests this and alleges that the termination was retaliatory. R. 86, Response to ¶ 12.

### A.    Myers's Workplace Injury

Myers's job as an Office Administrator did not require her to move furniture from the warehouse to the showroom floor, but she took on that job duty (in addition to her office duties) because she thought her help was needed. R. 77 ¶ 33. On July 24, 2003, Myers hurt her back while helping warehousemen move furniture into the store. *Id.* ¶ 35. The following day, a day Myers was already scheduled to be off work, Myers went to an urgent-care clinic to have her injury assessed. *Id.*

2

On July 25, 2003, Myers's doctor imposed work restrictions prohibiting her from moving furniture or lifting heavy objects for six weeks. *Id.* ¶ 36. Myers worked for the next six weeks, but continued to be in pain, and while she was able to perform everyday tasks (*e.g.*, grocery shopping and cleaning), Myers did not go to church or go out socially after her injury. *Id.* Upon learning of the injury, Wickes sent Myers to physical therapy for a total of 30, twice-a-week sessions. *Id.* ¶ 37. Through this period of physical therapy and the six-week restriction period, Myers admits that Wickes honored all of the work restrictions. *Id.* ¶ 38.[3] After completing physical therapy, in December 2003 Wickes sent Myers to a physician for an independent medical examination. *Id.* ¶ 38. Myers did not pick the physician for the independent examination. *Id.* ¶ 38. The independent examination report stated that Myers had reached "maximum improvement" and that no restrictions were necessary. *Id.* ¶ 39.

Because Myers had been cleared for work by the independent examination, Wickes's policy required her to bring in a doctor's note for absences. *Id.* ¶ 39. Although Wickes's Local Rule 56.1 statement says a note would be due for *any* absence, *id.*, Alisa Schueneman, a human resources officer for Wickes testified that a doctor's note would be needed for an absence of three days or more. R. 87-2, Schueneman Dep. at 46:5-10. On December 12, 2003, Myers brought a note from her treating doctor that said Myers could work a six-hour shift so long as there was no prolonged standing, repetitive

---

[3]The record does not make clear whether the restrictions that were originally imposed for six weeks were extended to the conclusion of physical therapy, or whether the restrictions changed over this period. Myers testified that before the independent examination, which occurred in December 2003, all restrictions were adhered to by Wickes. R. 77 ¶ 38.

movement, or heavy lifting; the restrictions were to last for 8 weeks. R. 86 ¶ 12; R. 87-1, Exh. C at 2.

On January 10, 2004, Myers was hospitalized due to severe pain in her back. R. 86 ¶ 14. The following day, in an email to store manager Brenda Green, Dave Mattea (Green's supervisor) responded to the news by writing, "She went from 6 hours a day[] to apparently zero and in the hospital." *Id.* Upon returning to work, Myers was required to work more than six hours per day, and Wickes also refused to honor the lifting and standing restrictions. *Id.* ¶ 15. In an email on February 7, 2004, Mattea wrote an email to his supervisor stating: "Brenda Green received a call from Brenda Myers today stating that she was told NOT to work due to her back injury. Sigh." *Id.* ¶ 16 (capitalization in original). On February 18, Myers received updated restrictions from her physician that imposed the same limitations for six weeks following that date. *Id.* ¶ 18. In a response dated February 19, Wickes took the position that it would not abide by the restrictions imposed by Myers's physician because the independent examination called for no further treatment or restriction. R. 87-1, Exh. D at 6.

On February 25, Myers saw a third physician who disagreed with the independent examination's conclusions, and stated that Myers should not be doing any lifting, twisting, or turning while at work. R. 87-1, Exh. C at 4. On June 6, 2004, Myers received further treatment from her treating physician, and he ordered Myers not to work from June 6 to June 10. R. 86 ¶ 21.

On July 26, 2004, Myers requested July 29 off from work for a medical appointment. R. 86 ¶ 22. Mattea approved the request on July 26, but then on July 27

4

told Myers she would have to reschedule the appointment. *Id.* Myers objected to Human Resources, and Mattea perceived this objection as "threatening." *Id.* ¶ 23. Due to the missed day of treatment, Myers's condition worsened, and she was required to miss work from July 30 to August 5. *Id.* ¶ 24. Mattea responded to the news with an email to human resources stating: "Amazing .... how is she being paid for last week[']s missed days?" R. 86 ¶ 25 (ellipses in original); R. 87-1, Exh. D at 12. Wickes charged these days against Myers's FMLA entitlement. R. 87-1, Exh. D at 11.

On October 1, 2004, Myers told Green that she would need to leave early on October 5 for an appointment. R. 86 ¶ 26. Green told Myers she would have to come in on a scheduled day off to make up for the time. *Id.* Myers did so on October 3. *Id.* Myers took off additional time under doctor's orders from October 8 to 11 and November 15 to 22. *Id.* ¶¶ 28-29. In response to Myers's final request for work off, Wickes's short-term disability administrator processed an application for benefits for Wickes. R. 87 ¶ 31. In an email regarding the application, the administrator wrote "I have NO documentation to support this claim .... She should be informed that no documentation is a[n] 'absence without approval.' She will be linking this all back to the [workers' compensation] issue anyway. I really can't help that." *Id.*; R. 87-1, Exh. D at 15.

## B. Myers's Job Performance and Behavior

During her employment with Wickes, Myers's work performance, as memorialized in several reviews and other correspondence, was checkered. In March 2000, Myers received the worst rating on a performance review, namely, a 4 on a scale

of 1 to 4, with 4 equaling the worst performance, and she was placed on a 90-day Performance Improvement Plan (PIP). R. 77 ¶ 16; R. 77, Exh. M at 1-2. In February 2001, Myers received a 1 on her performance review (by this time, the scale had changed to a range of 1 to 5, with 1 still equaling the best score). R. 77-16, Exh. F at 8.[4] Accompanying that positive evaluation was a recommendation that Myers receive a 5% increase in pay (this highest raise permitted by the form). *Id.*

In March 2002, Myers received a "3+" on the 5-point scale. R. 77 ¶ 17; R. 77-25, Exh. N at 1. In October 2003, she received a "2.5" on the 5-point scale. R. 77-27, Exh. P at 3. This review was performed by Derrick Asante, who was temporarily filling the manager position while Wickes sought a replacement store manager. R. 77 ¶ 19. Brenda Green filled the role of store manager in October 2003 (presumably shortly after Asante's review of Myers). R. 77 ¶ 20.

In March 2004, in a review performed by Brenda Green, Myers received an overall score of 4 on the 5-point scale. R. 77 ¶ 21; R. 77-28, Exh. Q at 2-3. In July 2004, Myers was named "Employee of the Quarter" at the store. R. 87-1, Exh. E at 2. Although Green had no hand in selecting Myers for the award—the award is based on a vote by the store workers, R. 86 ¶ 38—Green sent an email on July 15, 2004 memorializing the award, in which she wrote that "Myers has excelled in solving

---

[4]Exhibit F, like many other exhibits filed with docket entry 77, is split into several separate attachments on the electronic docket. Citations to specific page numbers refer to the page number of the .pdf file for the particular attachment number; for example, in this instance, the citation is to entry 77-16, which is the 16th attachment to entry 77, but is also labeled "Exhibit F-6." For all other citations to specific exhibits, the page number refers to the page number of the specific exhibit.

critical[] problems, [and] looks upon them as exciting and challenging. . . . [Myers] maximizes employees['] energy and their capabilities. She is now coa[c]hing toward achievements and success." R. 87-1, Exh. F at 2.

In September 2004, Green conducted another review of Myers, and this review turned out to be the last one before Myers was fired. R. 77 ¶ 21. The review does not identify an overall numeric score, but notes in the comment section, "Overall performance/ good job." R. 77-30, Exh. S at 3. Myers did not receive any scores of 4 or 5 (remember that 5 equals the worst) in any of the review categories. R. 77 ¶ 23. The review did not include any comments regarding poor attitude, negative behavior, or similar concerns. R. 86 ¶ 35. As did all other reviews, this review form included: "Note: An appraisal with any rating of a 4 or a 5 must be accompanied by a Performance Improvement Plan." R. 77-30, Exh. S at 3. As she had done for some of her prior, negative reviews, Myers provided a written response challenging some of Green's conclusions and ratings. R. 77 ¶ 24; R. 77-31, Exh. T.

On December 2, 2004, Green issued a written "Disciplinary Action" and placed Myers on a thirty-day performance improvement plan. R. 77 ¶ 25; R. 77-32, Exh. U. Mattea (Green's supervisor) was present when the disciplinary action and performance improvement plan were given to Myers, and he signed the documents. *Id.* The disciplinary action/performance improvement plan letter cited, among other things: Myers's attitude problems with co-workers and management (including eye rolling, intimidation, and walking away "in a huff") and a lack of respect for Green as Myers's immediate supervisor. *Id.* According to Wickes's Vice President of Human Resources,

Dick Petersen, before issuing a performance plan, a manager should attempt to counsel the employee. R. 86 ¶ 37. Furthermore, Petersen testified that in his 12 years at Wickes he was involved in 20 to 100 performance plans, and could not recall an instance of a performance improvement plan issuing without prior counseling steps. *Id.* Wickes did not provide counseling or any other written or verbal notice before issuing the performance improvement plan. *Id.* In addition to the limitations written into Myers's disciplinary action letter and performance improvement plan, Green also told Myers that "she was not to speak to anybody in regard to . . . what was going on because this was something between her and Wickes and [Green]." R. 103-1, Green Dep. at 19:12-24. Again, Myers submitted a written response disagreeing with the letter she received. R. 77 ¶ 27. Myers believed the disciplinary action was being taken in response to her back injury. R. 77 ¶ 25.

On December 20, 2004, Myers filed an EEOC charge alleging discrimination based on race, sex, age, and disability. R. 86 ¶ 1. A few weeks after assignment of the performance improvement plan, Myers approached some her coworkers regarding her EEOC charge. According to Green's affidavit, "a few weeks" after the disciplinary action letter, Myers bragged to two of her coworkers that she had filed a lawsuit against Wickes and then threatened the coworkers that she would also sue them if they testified against her. R. 77 ¶ 28; R. 102[5] ¶ 15. Green identified the coworkers as Sylvia Brixie and Gloria Lopeara in her deposition, and stated that they came to her

---

[5]Green's original affidavit, R. 79, was unsigned, but identical to her signed affidavit found at docket entry 102.

8

feeling concerned and threatened by Myers's behavior. R. 103-1, Green Dep. at 31. But that is not Brixie's account of what she told Green. According to Brixie, she was approached by Myers around Christmas 2004, and Myers expressed that: she thought Wickes was trying to wrongfully fire her, she had spoken to Human Resources but found them unhelpful, and "felt she had to go to the EEOC." R. 87-1, Exh. 2 ¶ 3. During the conversation, Myers asked Brixie if the EEOC could contact her to discuss Myers's work performance. *Id* ¶ 4. Brixie agreed to speak with the EEOC, and said she would tell the truth. *Id.* Brixie further states that (contrary to what Green claimed in her deposition) Myers never threatened her with litigation, and that "Myers did not threaten me in any way." *Id.* ¶ 5. Lastly, Brixie states that she told the same thing to Green, and later in May 2005, repeated the same story to an unnamed person in Wickes's Human Resources department. *Id.* ¶ 6-7.

Myers's "threatening and inappropriate" behavior to her coworkers, coupled with a general failure to meet the directives of her performance improvement plan, led Wickes to fire Myers. R. 77 ¶¶ 29-30. According to Green, Myers's inappropriate conversation with her coworkers was the "last straw that led to her termination." R. 103-1, Exh. A, Green Dep. At 29:18. Myers was fired January 8, 2005, effective immediately. R. 86 ¶ 7. She was informed of her termination by Green and Mattea, who both made the decision. *Id.* Per company policy, Petersen also had to, and did, sign off on the termination decision. R. 77 ¶ 12. At that meeting, Myers was told that one of the reasons she was being fired was because she was not supposed to be speaking to anyone about her employment issues with Wickes but had done so. R. 86 ¶ 7. In

9

testimony before the Illinois Department of Employment Security, Green testified that Myers was fired for asking coworkers to be witnesses for an EEOC complaint and because of poor job performance. R. 87-1, Exh. B at 2.

## II.

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment will be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in

10

support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.

### A.     FMLA Interference

Count 1 of the Complaint is a claim for interference with Myers's rights under the Family and Medical Leave Act. R. 34 at 3. Myers explicitly abandoned this claim in her summary judgment memorandum: "[Myers] agrees to the dismissal of Count I of her Second Amended Complaint." R. 88 at 9. As such, summary judgment is granted as to Count 1.

### B.     Disability Discrimination

Count 3 alleges discrimination by Wickes because of Myers's disability. R. 34 at 5. The Americans with Disabilities Act (ADA) prohibits employers from discriminating against disabled employees because of their disability. 42 U.S.C. § 12112(a). A plaintiff can prove disability discrimination by using either the direct or indirect method of proof. *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

#### 1.     Disability

In this case, Wickes first argues that Myers's ADA claim fails because she did not suffer from a "disability" within the meaning of the ADA. R. 76 at 8. A disability is defined under the ADA as: (A) a physical or mental impairment that substantially limits one or more major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

11

The type of "major life activities" that must be substantially limited to fall under the purview of the ADA include caring for oneself and walking. § 12102(2). Myers argues that she was substantially limited in caring for herself and in walking. R. 88 at 14-15.

There is sufficient evidence for a reasonable jury to find that Myers suffered from a disability. As evidence of impaired walking, Myers filed an affidavit in response to Wickes's summary judgment motion, and she averred:

> Beginning in February 2004, and throughout the remainder of my Wickes's employment, the pain in my back, groin and legs caused me to drag my right leg when I walked. I could sometimes walk with a limp. This condition has existed to the point that since 2005, and to date, I have walked with the assistance of a cane. R. 87, Exh. 1, Myers Declaration ¶ 27.

Myers included these facts in her Local Rule 56.1 Statement of Additional Facts, R. 86 ¶ 20, and recited them in her response brief, specifically in responding to Wickes's argument that she was not disabled. R. 88 at 14-15. Yet Wickes did not address the impaired-walking argument at all in its reply brief. *See* R. 96 at 4-5. And in Wickes's response to Myers's declaration in support of her Statement of Additional Facts, Wickes made three meritless arguments. R. 97 at 15 ¶ 20. Wickes argued that the evidence was irrelevant (but it is plainly relevant to the disability issue), the evidence was hearsay (but it is Myers's own testimony of facts within her personal knowledge, not told to her), and the evidence was not material (but that is a legal argument not discussed by Wickes in its briefing).

To be sure, Myers's declaration describing her impaired walking is possibly at odds with her deposition answers to questions asking what restrictions she suffered on her daily tasks; she specified only limitations on cleaning and grocery shopping. R.

12

77-6, Myers Dep. at 142-44, 147. But Wickes does not argue this point (perhaps the walking impairment was described in other parts of Myers's deposition). Nor does Wickes argue that the walking impairment was not otherwise identified in discovery and came as a surprise in the declaration. It might very well be that, after a full evidentiary presentation at trial, a jury will conclude that the walking impairment was not substantially limiting, or even that the evidence contradicts that there was a walking impairment. But Myers offers enough evidence in support, and Wickes offers nothing in response, so a jury must decide.

Myers's additional basis for her disability argument—limitations on grocery shopping and cleaning the house—also requires a jury resolution, although the survival of this disability basis is a closer call than the walking impairment. Myers's deposition testimony does describe these limitations, but the testimony does not necessarily establish that she was outright prevented from ever doing those chores, and the testimony also suggests that a cause of the limitations was having to deal with the demands of her full-time job:

> It became difficult to go to the grocery store. You know, I would go sometimes, but it was difficult. I didn't do my shopping like I normally would. . . . I know I got to the point where I couldn't clean at home, clean my house, but again, I'm working full-time. I kept working in pain every day. So when I got home, I didn't do much, if anything, except for prepare to go to work the next day.

R. 77-6, Myers Dep. at 142-43; see also *id.* at 142 (". . . because I'm working full-time, and I'm up and down, and then by the time I leave work, I could do nothing but go

home and try to take care of myself so I could report to work the next day.").[6] Also weighing against Myers is *Squibb v. Memorial Medical Center*, 497 F.3d 775, 784 (7th Cir. 2007), a case cited by Wickes. In *Squibb*, the plaintiff, similar to Myers, claimed that she was "limited in her ability to do household tasks such as cooking, cleaning[,] and grocery shopping, although she performs certain of these tasks on occasion." *Id.* *Squibb* stated that, "[i]n light of the tasks she admittedly can perform (driving, bathing, brushing her teeth, dressing herself), we must conclude that, as a matter of law, the limitations she claims do not demonstrate that she is 'prevent[ed] or severely restrict[ed]' from caring for herself." *Id.* (quoting *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002)). But *Squibb* did not purport to establish an absolute rule that the ability to engage in the specified tasks would always bar a finding of disability. It would be hard to set a blanket rule because the ADA's text asks whether "an individual" has a disability, and thus "whether a person has a disability under the ADA is an individualized inquiry." *EEOC v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 442 (7th Cir. 2008) (quoting *Sutton v. United Air Lines*, 527 U.S. 471, 483 (1999)). Here, for example, Myers's walking impairment—which caused her to drag her right leg and sometimes walk with a limp—should also be considered when evaluating the limitations she described in cleaning and grocery shopping, which both require walking. Again, just as with the walking impairment, the Court is not concluding that

---

[6]It is also not clear (at least from the deposition excerpts filed on the docket) what corrective measures were applied to deal with the pain. See R. 77-5, Myers Dep. at 140 (cannot recall what painkillers were prescribed initially), Myers Dep. at 148-49 (no pain management component to the treatment other than painkillers).

Myers will coast to victory with a jury. *See e.g., EEOC v. AutoZone, Inc.*, 630 F.3d 635, 640 (7th Cir. 2010) (listing much more severe limitations on self-care). Indeed, the very fact that she worked a full-time job and could list only limitations on grocery shopping and cleaning will count against her. But Myers has presented enough to get to a jury on whether her medical condition substantially limited the ability to care for herself.[7]

### 2.    Evidence of Discrimination

Wickes also argues that, even if Myers's disability is a jury question, there is insufficient evidence of disability discrimination. R. 76 at 11-12. Specifically, Wickes maintains that a reasonable jury could find only that Myers was fired for job performance problems, namely, her purported inability to deal effectively with coworkers and with supervisors. But Myers presents a persuasive mosaic (at least convincing enough for a reasonable jury) of circumstantial evidence that the relevant decisionmakers discriminated on the basis of disability. First, in the September 2004 performance evaluation, supervisor Green wrote in the comment section, "Overall performance/ good job." R. 77-30, Exh. S at 3. There was no overall numerical score, but in the individual review categories, Myers did *not* receive any scores of 4 or 5 (5 equals the worst). R. 77 ¶ 23. And the review did *not* include any comments regarding poor attitude, negative behavior, or similar concerns. R. 86 ¶ 35. Yet just 3 months later, on December 2, 2004, Green put Myers on a performance improvement plan. Of course,

---

[7]It is worth noting that Myers does not argue that the ADA Amendments Act of 2008 applies retroactively to her case. *See Pennie v. United Parcel Service*, 2009 WL 855787, at *15 (N.D. Ill. March 30, 2009).

it is possible that Myers's performance deteriorated in those 3 months, but the performance improvement plan is also suspicious because Green put Myers on the plan without any prior counseling of Myers. The absence of prior counseling was contrary to Wickes's general practice: the company's Human Resources Vice President, Dick Petersen, testified that, before issuing a performance plan, a manager should attempt to counsel the employee. R. 86 ¶ 37. Even more telling, in Petersen's dozen years at Wickes, he could not recall a single instance (out of the 20 to 110 plans in which he had been involved) where a manager imposed a performance improvement plan without first engaging in counseling, steps. *Id.* Wickes offers no explanation for the sudden imposition of the performance improvement plan . It is also worth noting, in considering whether the performance problems were pretext for discrimination (or retaliation), that in July 2004, Myers was named "Employee of the Quarter" at the store. R. 87-1, Exh. E at 2. This honor was awarded based on the vote of her coworkers, R. 86 ¶ 38, whom supposedly Myers could not effectively deal with by December 2004. Plus, when Green sent an email in July 2004 to announce the award, she wrote that "Myers has excelled in solving critical[] problems, [and] looks upon them as exciting and challenging. . . . [Myers] maximizes employees['] energy and their capabilities. She is now coa[c]hing toward achievements and success." R. 87-1, Exh. F at 2. Again, perhaps Myers's ability to deal with coworkers plummeted after the July 2004 award and the September 2004 evaluation, but a jury could reasonably draw another conclusion.

16

What's more, overlaying all of this evidence is the negative tone of the emails and reactions between Green, Mattea, and Human Resources—the parties who made the termination decision—denigrating Myers's requests for time off of work. Starting as early as January 2004, Mattea (Green's supervisor), complained to Green in an email that Myers had gone from working 6 hours per day to requiring hospitalization: "She went from 6 hours a day[] to apparently zero and in the hospital." R. 86 ¶ 14. After Myers returned, Wickes also refused to honor the lifting and standing restrictions. *Id.* ¶ 15. In another email, this time in February 2004, Mattea expressed his frustration with Myers's back pain with an electronic "Sigh": he wrote, "Brenda Green received a call from Brenda Myers today stating that she was told NOT to work due to her back injury. Sigh." *Id.* ¶ 16 (capitalization in original). More emails and reactions of this sort in July and October 2004 showed Mattea's and Green's continued frustration with Myers's back pain. R. 86 ¶¶ 22, 24, 25, 26; R. 87-1, Exh. D at 12. All of these facts taken collectively allow a reasonable juror to conclude that Mattea and Green discriminated on the basis of disability. To repeat, there is evidence to the contrary, and evidence that there were non-discriminatory reasons for Mattea's and Green's frustration, but the only question at this stage of the case is whether a reasonable jury could conclude otherwise. Summary judgment is denied on the disability discrimination claim.

## C.    Retaliation

Myers alleges retaliation for asserting rights protected under various federal laws throughout her complaint. R. 34 at 4 ("Count II - Retaliation Under the FMLA");

17

R. 34 at 5 ("Count III - Discrimination and Retaliation Against Plaintiff Because of Her Disability"); R. 34 at 6 ("Count IV - Retaliation") (asserting a claim for retaliation against rights exercised under the ADA, Title VII, and the Age Discrimination in Employment Act). These counts can be grouped into two claims.[8]

### 1.    FMLA Retaliation

In addition to granting employees the right to take family and medical leave, the FMLA also bars employers from discriminating against employees who exercise their FMLA rights. 29 U.S.C. § 2615(a)(1). Specifically, the FMLA prohibits employers from taking into account FMLA leave as a factor in employment decisions. 29 C.F.R. § 825.220. When an employee alleges a retaliatory discharge under the FMLA, she may establish that her employer engaged in retaliation through one of two ways: the indirect method and the direct method. *Goelzer v. Sheboygan County*, 604 F.3d 987, 995 (7th Cir. 2010).

To proceed under the indirect method, Myers "must show that after taking FMLA leave (the protected activity) [she] was treated less favorably than other similarly situated employees who did not take FMLA leave, even though [she] was performing [her] job in a satisfactory manner." *Hull v. Stoughton Trailers*, 445 F.3d

---

[8]Myers's complaint references ADA retaliation in both Counts 3 and 4. R. 34. Title VII and ADEA retaliation are explicitly referenced in Count 4. *Id.* While the parties' memoranda separate FMLA retaliation from the other federal-law retaliation claims (based on Title VII, ADA, and ADEA), the parties do not separate out ADA retaliation versus Title VII retaliation versus ADEA retaliation. Following that lead, the Court will address the FMLA claim, and then address the other claims together.

949, 951 (7th Cir. 2006). Neither party has asserted any facts concerning similarly-situated employees, so Myers must proceed to the direct method.

Under the direct method, a plaintiff must present evidence that her employer took materially adverse action against her on account of her protected activity. *Burnett*, 472 F.3d at 481. "If [the evidence is contradicted,] 'the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive . . . .'" *Id.* (quoting *Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). The plaintiff can overcome summary judgment by producing circumstantial evidence of retaliation such that a jury could infer retaliation. *Phelan v. Cook Cnty.*, 463 F.3d 773, 788 (7th Cir. 2006).

The parties do not dispute that Myers engaged in protected activity when she requested medical leave for her back injury. Wickes's defense to the FMLA retaliation claim relies solely on an argument that "Myers['s] claim is devoid of any direct or circumstantial evidence to support her assertion that she was terminated for any reason *other than* her well-documented poor attitude and behavior problems." R. 76 at 7 (emphasis in original). But as explained above, there is a genuine issue over whether Myers was indeed unable to deal with coworkers or acting insubordinately. Her most recent job performance evaluation did not mention those problems, and indeed supervisor Green summed up Myers's overall performance with the "good job" compliment. Add in the lack of counseling, contrary to Wickes's practice, before the imposition of the performance improvement plan, plus the cutting comments and

reactions to Myers's absence and restrictions arising from the back injury, and the evidence is sufficient for a reasonable jury to find Myers's firing was in retaliation for her asserting her FMLA rights.

### 2. ADA/Title VII/ADEA Retaliation

Count 4 of the complaint alleges retaliation for asserting rights under various federal laws. R. 34 at 6. To prevail on these retaliation claims, a plaintiff can proceed under the direct or indirect method. *Silk v. City of Chicago*, 194 F.3d 788, 799 (7th Cir. 1999). The direct method requires a plaintiff to show that: (1) she engaged in protected activity; (2) she suffered an adverse action; and (3) there is a causal link between the protected activity and the adverse action. *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005) (direct method for Title VII retaliation claims); *Dickerson*, 657 F.3d at 601(ADA retaliation direct-method elements are the same); *Brenner v. Brown*, 36 F.3d 18, 19 (7th Cir. 1994) (same elements apply to ADEA retaliation claims).[9] "Myers proceeds only under the direct method of proof."[10] R. 88 at 2. Wickes concedes that Myers's firing constitutes an adverse action, R. 76 at 13, and so the only

---

[9]Wickes argues that the retaliation claim should be limited to Title VII retaliation, because the January 2005 EEOC charge was based on Title VII alone. R. 96 at 3. Wickes waived this argument by raising it for the first time in reply. *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011). Moreover, Wickes did not include a copy of the EEOC charge with its reply brief. An actual examination of the EEOC charge, which was attached to the complaint, R. 1, shows that Myers did allege retaliation under the ADA. The cover-page text does say retaliation for "Title VII" protected activity, but then the form marks "Disability" as the grounds of discrimination. R. 1, 2005 Charge ¶ 9. Additionally, the substantive handwritten allegations reflect retaliation allegations, including being disciplined in violation of company policy and procedures, Charge ¶ 13.

[10]As she must; because, as noted above, Myers has not presented any similarly-situated analysis.

20

remaining questions are whether Myers engaged in protected activity and whether the termination and protected activity are linked. The first question is quickly answered. Myers filed her EEOC claim on December 20, 2004, and filing an EEOC charge is explicitly recognized as protected activity. 42 U.S.C. § 2000e-3.

To prove causation, Myers may offer a "convincing mosaic" of circumstantial evidence from which a reasonable trier of fact could infer the necessary connection between protected activity and adverse action, or she can provide direct evidence.[11] *Coleman v. Donahoe*, —F.3d—, 2012 WL 32062 at *18 (7th Cir. Jan. 6, 2012). Once again, as explained above, there is sufficient evidence for a reasonable jury to find that retaliation, not performance problems was the basis for the firing. The timing is also suspicious because Myers filed the EEOC charge on December 20, 2004, and just a few weeks later, on January 8, 2005, she was fired. Suspicious timing is a piece of evidence from which a retaliatory intent can be drawn. *Id.* at *19. Not only did Myers file an EEOC charge, but she tried to enlist the help of coworkers in proving her claim. Green's reaction to that attempt—it was supposedly the "last straw" and required Myers's firing—comes close to an admission of retaliation. Asking for help from coworkers to provide truthful testimony is itself protected activity; an employer cannot forbid discussions with coworkers simply because, as Green thought, the employer considers an EEOC charge as a matter between the employer and the employee. To be

---

[11]In addition to succeeding under a "convincing mosaic" theory, Myers might also succeed in showing causation via direct evidence. Green specifically identified Myers's conversation with Brixie as the final straw, and Brixie's declaration identifies the EEOC charge as the substance of their conversation.

sure, Green believed that Myers had approached coworkers in a threatening manner, which would not be protected activity, but at least one of the coworkers flatly denied that Myers had been threatening. Summary judgment is denied as to the retaliation claims in Counts 3 and 4.

### C. Retaliatory Discharge

Myers's final claim is a state-law claim for retaliatory discharge due to her assertion of a workers' compensation claim. To prove this claim, Myers must show that: (1) she was employed at Wickes before her injury; (2) she exercised a right under the Illinois Workers' Compensation Act; and (3) her discharge was causally related to the exercise of her right under the Act. *Clemons v. Mechanical Devices Co.,* 704 N.E.2d 403, 406 (Ill. 1998). A valid, nonpretextual basis for the termination decision prohibits a finding of causation. *Id.* It is on this basis that Wickes seeks summary judgment. R. 76, 14-15. But, as discussed above, Myers has offered evidence that could permit a reasonable trier of fact to conclude that the purported performance problems were a pretext. Additionally, there is evidence of a link between the termination decision to Myers's workers' compensation claim, namely, an email from the short-term disability administrator, *supra* § I.A., which may be interpreted by a reasonable juror as an accusation that Myers was lying or cheating with her workers's compensation claim. This email ties together the causation analyses of the FMLA retaliation claim and the retaliatory discharge claim, because it suggests that Wickes was treating the exercise of FMLA and workers' compensation rights as one in the same. And, as explained above, Mattea and Green expressed frustration with Myers's exercise of these rights.

22

These facts allow a reasonable trier of fact to conclude that part of the termination decision was premised on Myers's assertion of her workers's compensation claim. Accordingly, summary judgment is denied as to Count 5.

## IV.

For the reasons stated above, Wickes's motion for summary judgment, R. 75, is granted in part and denied in part. It is granted as to Count 1, but denied as to the disability discrimination claim in Count 3 and the retaliation claims in Counts 3, 4, and 5.

ENTERED:

_____
Honorable Edmond E. Chang
United States District Judge

DATE: February 21, 2012